United States District Court
Southern District of Texas

**ENTERED**

July 19, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| KIZZIE FOREMAN, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § CIVIL ACTION NO. H-15-1961 |
| | § |
| CAROLYN W. COLVIN, | § |
| ACTING COMMISSIONER OF THE | § |
| SOCIAL SECURITY ADMINISTRATION, | § |
| | § |
| Defendant. | § |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 17) and Defendant's Cross Motion for Summary Judgment (Doc. 13). The court has considered the motions, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's Motion be **GRANTED** and Defendant's motion be **DENIED**, and that this matter be **REMANDED** to the Commissioner for further consideration consistent with this opinion.

### I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claims for supplemental security income ("SSI") under Title XVI of the

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 10.

Social Security Act ("The Act") and disability insurance benefits (collectively "benefits") under Title II of The Act.[2]

## A.   <u>Medical History</u>

Plaintiff was born on February 18, 1977, and was thirty years old on the date of the alleged onset of disability.[3] Plaintiff completed the twelfth grade and previously worked as a shuttle driver and cashier, last working in 2006.[4]   Plaintiff first applied for benefits on May 29, 2012.[5]   Prior to Plaintiff's alleged onset date, Plaintiff had a history of migraine headaches, neck pain, hypertension, and obesity.[6]

On November 2, 2009, Plaintiff visited Giang L. Nguyen, M.D., ("Dr. Nguyen") at Squatty-Lyons Community Health Center ("Lyons Clinic"), and reported hypertension and headache pain that had persisted for three months.[7]   Dr. Nguyen noted that Plaintiff had "headache of the [r]ight side . . . aching—like, radiating to the [right] neck."[8]   Dr. Nguyen recommended a non-prescription dose of ibuprofen for Plaintiff's headache pain.[9]

---

[2]   <u>See</u> Tr. of the Admin. Proceedings ("Tr.") 141, 149.

[3]   <u>See</u> <u>id.</u>

[4]   <u>See</u> Tr. 168, 230.

[5]   <u>See</u> Tr. 147.

[6]   <u>See</u> Tr. 460, 456, 471.

[7]   <u>See</u> Tr. 268.

[8]   <u>See</u> Tr. 269.

[9]   <u>See</u> Tr. 270.

Dr. Nguyen also diagnosed Plaintiff with anxiety and prescribed fluoxetine as treatment.[10]   Plaintiff returned to The Lyons Clinic on November 24, 2009, for a routine exam, and again complained of neck pain and anxiety.[11]   Dr. Nguyen noted, however, that Plaintiff experienced less anxiety with medication.[12]

Plaintiff returned to the Lyons Clinic after a fall on March 24, 2010.[13]   Dr. Nguyen recorded that Plaintiff had "positive" psychiatric symptoms.[14]   Dr. Nguyen prescribed citalopram to treat Plaintiff's increased anxiety symptoms.[15]   Plaintiff continued to take ibuprofen to treat her headaches and neck pain.[16]

On July 23, 2010, Plaintiff returned to The Lyons Clinic, complaining of continued headaches on the right side.[17] Nagarajarao Srinivasamurthy, M.D., ("Dr. Srinivasamurthy") prescribed no additional medication.[18]   Plaintiff subsequently

---

[10]    See Tr. 269.

[11]    See Tr. 262

[12]    See id.

[13]    See Tr.  260.

[14]    See id.

[15]    See id.

[16]    See Tr. 256.

[17]    See id.

[18]    See id.

returned to the Lyons Clinic two weeks later and again complained of continued neck pain, headaches, and vision changes.[19]

On February 1, 2012, Plaintiff sought treatment for headaches and associated earache pain from James La Rose, M.D., ("Dr. La Rose") at Bretshire Medical Clinic ("Bretshire").[20]  Dr. La Rose confirmed Plaintiff's hypertension and prescribed 800 milligrams of ibuprofen (taken three times daily) to treat her headache and earache pain.[21]

Plaintiff returned to Dr. La Rose on March 20, 2012, and again reported headaches.[22]  As treatment for Plaintiff's persistent pain, Dr. La Rose refilled Plaintiff's ibuprofen prescription.[23]  Additionally, Dr. La Rose referred Plaintiff to an outpatient neurological center for a consultation and evaluation of her persistent headaches and neck pain.[24]

On March 22, 2012, Plaintiff visited Cheor J. Kim, M.D., ("Dr. Kim") at Heights Neurological Association for an initial consultation and evaluation of her headaches and neck pain.[25]

---

[19]    See Tr. 253.

[20]    See Tr. 339.

[21]    See Tr. 340.

[22]    See Tr. 341.

[23]    See Tr. 347.

[24]    See Tr. 343.

[25]    See Tr. 404-07.

Dr. Kim diagnosed Plaintiff's headaches, confirmed Plaintiff's hypertension, and diagnosed Plaintiff's neck pain as "cervical radiculopathy of right C7-C8."[26]   Dr. Kim prescribed Ultram (tramadol) to treat Plaintiff's pain.[27]   Dr. Kim recommended diagnostic Magnetic Resonance Imaging ("MRI") tests of Plaintiff's cervical spine and brain to determine the cause of her headaches and neck pain.[28]

On April 3, 2012, Plaintiff underwent MRI tests of the cervical spine at North Houston Imaging Center.[29]   The MRI, read by J.S. Lee, M.D., ("Dr. Lee") found "Chiari malformation I," "foraminal stenosis" of the C3-C4, "mild to moderate foraminal stenosis bilaterally, more on the right due to uncovert[e]bral facet arthropathies on the right" of the C4-C5, and "foraminal stenosis bilaterally" of the C5-C6 vertebrae.[30]   Dr. Lee's impression was "Chiari malformation I" and "canal and foraminal stenosis."[31]

On April 6, 2012, Plaintiff had two follow-up MRIs at North Houston Imaging Center, one of the brain and one of the cervical

---

[26]     See Tr. 403.

[27]     See Tr. 407.

[28]     See Tr. 403.

[29]     See Tr. 401.

[30]     See Tr. 400.

[31]     See Tr. 401.

spine.[32]   The brain MRI was unremarkable, as read by Francis Lee, M.D., ("Dr. Lee").[33]   The cervical spine MRI, also read by Dr. Lee, showed "desiccation of the disc material throughout," as well as disc bulges and "a [fifty percent] narrowing of the neural foramen."[34]

After the MRIs, Dr. Kim recommended a conservative course of treatment with regular follow-up evaluations.[35]   Dr. Kim saw Plaintiff again on April 24, 2012, and regularly monitored Plaintiff's cervical radiculopathy, foraminal stenosis, and her resultant headaches and neck pain.[36]   Dr. Kim treated Plaintiff's pain with Vicodin, and Plaintiff's anxiety with Klonopin.[37]

On June 4, 2012, Plaintiff visited Bretshire for a routine hypertension evaluation.[38]   Dr. La Rose refilled Plaintiff's ibuprofen prescription for headache pain.[39]   Plaintiff continued regularly scheduled visits at Bretshire to monitor her hypertension and have regular check-ups.   At each check-up,

---

[32]   See Tr. 399, 402.

[33]   See Tr. 398.

[34]   See Tr. 397.

[35]   See Tr. 433.

[36]   See Tr. 389.

[37]   See Tr. 387.

[38]   See Tr. 347.

[39]   See Tr. 348.

Plaintiff's headaches were noted, and Plaintiff's ibuprofen prescription was refilled every ninety days.[40]

On July 10, 2012, Dr. Kim administered an Electromyogram ("EMG").[41]   The results showed a "suggestion of right C7-C8 nerve root irritation."[42]   On August 7, 2013, Dr. Kim refilled Plaintiff's Vicodin prescription for her headaches and neck pain.[43]

On December 8, 2012, at Bretshire, Dr. La Rose saw Plaintiff for routine hypertension evaluation and refilled Plaintiff's ibuprofen prescription for headache and neck pain.[44]   On December 21, 2012, Dr. Kim prescribed an increased dose of Vicodin for Plaintiff's headaches and neck pain.[45]   Dr. Kim continued to prescribe higher doses of Vicodin consistent with Plaintiff's reported pain levels.[46]   Dr. Kim monitored Plaintiff's Chiari malformation I, stenosis, cervical radiculopathy, and resultant

---

[40]   See Tr. 503.

[41]   See Tr. 382.

[42]   See Tr. 383.

[43]   See Tr. 378.

[44]   See Tr. 586.

[45]   See Tr. 531.

[46]   See Tr. 518, 522, 523.

headaches and neck pain every two weeks.[47]   Dr. Kim refilled Plaintiff's pain medication at each of these visits.[48]

Plaintiff continued to see Dr. La Rose as well.  On March 8, 2013, Dr. La Rose saw Plaintiff for routine evaluation of hypertension.[49]  Dr. La Rose also refilled Plaintiff's ibuprofen prescription for headache and neck pain on that date and on June, 11, 2013, and September, 11, 2013, as well.[50], [51], [52]

**B.   Application to Social Security Administration**

Plaintiff filed for benefits on May 29, 2012, claiming inability to work since January 1, 2008, due to stenosis, dizziness, high blood pressure, pinched nerves in the neck and back, and headaches.[53]

In a disability report, Plaintiff stated that she was five-feet-eight-inches tall, weighed 265 pounds, and had previous work experience as a cashier and shuttle driver.[54]

---

[47]     See Tr. 375-96.

[48]     See Tr. 620-24.

[49]     See Tr. 548.

[50]     See Tr. 573.

[51]     See Tr. 549.

[52]     See Tr. 540.

[53]     See Tr. 141, 147, 167.

[54]     See Tr. 167, 168.

On or about July, 5, 2012, Plaintiff completed a function report outlining her daily activities.[55]   Plaintiff stated that she could not work because her conditions limited her ability to stand and lift, that she was in pain, that she was likely to fall, and that she had poor vision.[56]

Plaintiff stated that before the onset of her disability she was able to exercise, work, and sleep, but pain affected her ability to do those activities.[57]   Plaintiff stated that she was able to make simple meals, such as sandwiches and salads; however, Plaintiff also reported that she burned food because of memory lapses.[58]   Plaintiff stated that she could not perform household chores like laundry, ironing, or cleaning, because she lacked strength and was in pain.[59]   Plaintiff listed her only hobby as watching TV.[60]   Plaintiff reported that she was not social, did not see other people, and left the house only for grocery shopping once a week.[61]

---

[55]   See Tr. 185.

[56]   See Tr. 193.

[57]   See Tr. 194.

[58]   See Tr. 195.

[59]   See id.

[60]   See Tr. 190.

[61]   See Tr. 191, 189.

Plaintiff listed her daily activities as getting up, using the restroom, getting back into bed, eating breakfast, and taking medication.[62]   Plaintiff stated that she lived with her son, who was sixteen years old and received SSI.[63]   Plaintiff also stated that she separated from her husband in 2005.[64]

On October 23, 2012, James Wright, M.D., ("Dr. Wright") completed a residual functional capacity assessment ("RFC") of Plaintiff.[65]   Dr. Wright made a primary diagnosis of cervical radiculopathy, and a secondary diagnosis of hypertension, but did not mention Plaintiff's other impairments.[66]   Dr. Wright found that, aside from limited overhead reaching because of pain, Plaintiff had no physical limitations.[67]   Dr. Wright opined that "the alleged limitations [were] partially supported by the medical and other evidence of the record" but, "the alleged severity and limiting effects . . . [were] not wholly supported."[68]

---

[62]   See Tr. 194.

[63]   See Tr. 150, 142.

[64]   See Tr. 150.

[65]   See Tr. 438.

[66]   See id.

[67]   See Tr. 439-45.

[68]   Tr. 445.

Dr. Kim also completed an RFC assessment in the form of a questionnaire.[69] Consistent with his frequent evaluations of Plaintiff, Dr. Kim stated that Plaintiff's primary diagnosis was Chiari malformation I, the symptoms of which included neck pain radiating to right the right arm.[70] Dr. Kim opined that, as a result of her condition, Plaintiff would be absent from work four or more days a month, that Plaintiff was capable of lifting less than ten pounds infrequently, and that Plaintiff's movement should be generally limited due to pain experienced as a result of her condition.[71]

Plaintiff's applications for benefits were denied at the initial and reconsideration level.[72] On December 20, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[73]

---

[69]   See Tr. 475.

[70]   See id.

[71]   See Tr. 477-78.

[72]   See Tr. 83, 87, 94.

[73]   See Tr. 101.

**C.  Hearing**

At the ALJ hearing, Plaintiff and a vocational expert ("VE") testified.[74]  Plaintiff was represented by an attorney.[75]

Plaintiff testified that she was five-feet-eight inches tall and weighed 255 pounds.[76]  Plaintiff testified that she was separated from her husband and that she lived with her sixteen-year-old son.[77]  Plaintiff also testified that she did not drink, smoke, or use drugs.[78]  Plaintiff further testified that she graduated high school and underwent some training as a medical coder and funeral director.[79]

Plaintiff stated that her last employment was in 2003 as a cashier.[80]  The VE testified that Plaintiff's former employment as a shuttle driver qualified as medium exertion level, semi-skilled work.[81]  The VE also testified that Plaintiff's former cashier position was an unskilled, light exertion level position.[82]

---

[74]   See Tr. 27.

[75]   See id.

[76]   See Tr. 36.

[77]   See Tr. 37.

[78]   See id.

[79]   See Tr. 34.

[80]   See Tr. 34-35.

[81]   See Tr. 35.

[82]   See id.

Plaintiff testified that she left her last full-time position as a shuttle driver because she was injured.[83] Plaintiff stated that she collapsed after moving luggage from one shuttle to another, woke up in the hospital, and has since been unable to perform in work environments because of headaches and "a lot of pain."[84]

The ALJ asked several questions regarding Plaintiff's headaches and associated pain.[85] Plaintiff testified that her headaches started in 2004, had been going on for years, and that she had pain in the back of her head in addition to the headaches.[86] Plaintiff testified that her headaches occurred everyday, and when they occurred she went to a very dark room and took her medication with water.[87] Plaintiff testified that her headaches felt like "bombs exploding."[88]

Plaintiff additionally testified about her current medications. Plaintiff stated that she was taking hydrocodone, lorazepam, Diovan, atenolol, albuterol, Cymbalta, gabapentin, loratidine, hydrochlorothiazide, benzocaine, levothyroxine, and

---

[83] See Tr. 37.

[84] See Tr. 37-38.

[85] See Tr. 39-40.

[86] See Tr. 39.

[87] See id.

[88] See Tr. 59.

other medications, amounting to about twenty prescriptions in total.[89]

Plaintiff also testified that Dr. La Rose was her primary care physician and that he referred her to Dr. Kim, a neurologist.[90] When asked what Dr. Kim's diagnosis was, Plaintiff testified that Dr. Kim said that "My neck [was] no good."[91] Plaintiff testified that Dr. Kim wanted to recommend surgical correction of her condition, but found that she was not a candidate for surgery.[92] Plaintiff testified that she "tr[ied] not to think about [her condition]."[93] Plaintiff also testified that Dr. Kim had not given a future prognosis of her condition.[94]

Plaintiff stated that, in addition to her constant headaches, she had unremitting neck pain every day.[95] The pain was especially noticeable when Plaintiff rotated her head from left-to-right.[96] Plaintiff further testified that she also

---

[89]   See Tr. 41-44

[90]   See Tr. 46.

[91]   See Tr. 46.

[92]   See Tr. 47.

[93]   See Tr. 47-48.

[94]   See Tr. 58.

[95]   See Tr. 47.

[96]   See Tr. 50.

suffered from pain in the middle of her back, and that the pain extended to her shoulder and occasionally to her knees.[97]

Plaintiff testified that she needed to lie down about six times per day for thirty minutes to one hour on each occasion.[98] Plaintiff testified that she spent most of her day lying down.[99]

Both the ALJ and Plaintiff's attorney posed hypotheticals to the VE.[100]   The ALJ first proposed a hypothetical person of Plaintiff's same age, education and work experience, who was limited to sitting six hours, standing and walking six or more hours, lifting and carrying fifty pounds occasionally and twenty-five pounds frequently.[101]   The VE testified that such person would be able to perform Plaintiff's past relevant work as a cashier and a shuttle driver.[102]

The ALJ next proposed a hypothetical individual who was limited to sitting six hours, standing and walking six hours, lifting and carrying twenty pounds occasionally and ten pounds frequently, able to climb occasionally, but no climbing of ladders, ropes, or scaffolds, and limited to occasional stooping

---

[97]   See Tr. 47-48.

[98]   See Tr. 53.

[99]   See id.

[100]   See Tr. 62.

[101]   See id.

[102]   See id.

and crouching, no overhead lifting or reaching, performing frequent handling and fingering, and limited to avoiding pulmonary irritation.[103]   The VE testified that such a hypothetical person would be able to perform Plaintiff's past relevant work as a cashier.[104]   The VE additionally testified that in the national economy, the positions of "office helper" and "small products assembler" were also available.[105]

The ALJ proposed a final hypothetical person limited to sitting six hours, standing and walking two hours, lifting and carrying ten pounds frequently with occasional bending, crouching, and stooping.[106]   The VE assessed that this hypothetical person would be limited to unskilled, sedentary exertion level positions, such as telephone solicitor and sorter.[107]

Plaintiff's attorney posed a hypothetical person of Plaintiff's same age, education, and work experience, who would be absent from work four or more days a month.[108]   The VE testified that there would be no available jobs for such an

---

[103]     See Tr. 62-63.

[104]     See Tr. 63.

[105]     See Tr. 63.

[106]     See Tr. 64.

[107]     See Tr. 64-65.

[108]     See Tr. 69.

individual.[109]    Plaintiff's attorney also posed a hypothetical individual who must lie down for six hours of the day.[110]   The VE responded that there would be no jobs for such an individual.[111]

After the hearing, the ALJ ordered an assessment of Plaintiff conducted by a non-treating, examining neurologist, Christopher M. Loar, M.D., ("Dr. Loar").[112]   Dr. Loar evaluated Plaintiff on December 27, 2013.[113]   Upon examining Plaintiff, Dr. Loar determined that Plaintiff "appear[ed] to be in no acute distress."[114]

Dr. Loar determined that Plaintiff had normal muscle bulk and tone, that individual muscle group testing was "graded as a 5/5," that Plaintiff could "walk with a normal natural gait" and that "skull and spine exam shows no masses, lesions or tenderness."[115]

Dr. Loar's impression of Plaintiff's medical records was that Plaintiff had a history of headaches, right arm pain, and a history of abnormal brain imaging showing Chiari malformation

---

[109]    See id.

[110]    See Tr. 68.

[111]    See id.

[112]    See Tr. 72.

[113]    See Tr. 608.

[114]    See Tr. 609.

[115]    See id.

I.[116]   Additionally, in Dr. Loar's summary of Plaintiff's medical records, he omitted a diagnosis of stenosis shown by the MRI exams.

Dr. Loar's physical evaluation of Plaintiff revealed that she had full range of motion, and, as a result, Dr. Loar determined that Plaintiff was capable of a full range of medium work.[117] Dr. Loar determined that Plaintiff could occasionally lift and carry as much as one hundred pounds, noting that Plaintiff did not appear to be in as much pain as she indicated.[118]   Although Dr. Loar noted that Plaintiff asserted that loud noises made her headache pain worse, Dr. Loar found that Plaintiff had no noise restrictions on her work environment, and found that Plaintiff could work in an environment with loud noises all day.[119]

**D.   Commissioner's Decision**

---

[116]   <u>See</u> Tr. 610.

[117]   <u>See</u> Tr. 615.

[118]   <u>See</u> Tr. 612-15, 611.

[119]   <u>See</u> Tr. 608, 618.

On February 18, 2014, the ALJ issued an unfavorable decision.[120]  The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period, and that Plaintiff had two severe impairments: (1) headaches; and (2) morbid obesity.[121]

The ALJ specifically noted that although Plaintiff suffered from anxiety and hypertension, those conditions were not severe because they were under control with medication.[122]  The ALJ also found Plaintiff's Chiari malformation I not severe.[123] The ALJ explained his finding in a single conclusory sentence: "[Plaintiff's] [C]hiari malformation Type I is not a severe impairment as the diagnosis by [Dr. Kim], a treating neurologist, is not supported by clinical and laboratory findings that would support such a slight abnormality having such minimal effect on [Plaintiff's] ability to work."[124]  It is unclear from this single sentence whether the ALJ found the Chiari malformation I not medically determinable or not severe.

After dismissing Plaintiff's Chiari malformation I, the ALJ briefly considered Plaintiff's stenosis, pinched nerves, and

---

[120]    See Tr. 9.

[121]    See Tr. 14.

[122]    See id.

[123]    See id.

[124]    See id.

dizzy spells.[125]   The ALJ determined that, "In this case, the medical record does not substantiate these conditions and [sic] are considered not medically determinable."[126]

After determining that Plaintiff's headaches and morbid obesity were severe impairments the ALJ next evaluated whether Plaintiff had impairments that met or medically equaled a Listing.[127]   The ALJ mentioned only Plaintiff's hypertension and Listing 4.00(H)(1), noting that while there was no specific Listing for hypertension, it should be evaluated by reference to specific body systems.[128]   Because no specific body system was affected, the ALJ determined that Plaintiff's hypertension did not meet or medically equal any Listing.[129]

The ALJ then determined that Plaintiff retained the RFC to perform a full range of medium work.[130]   The ALJ stated that, in arriving at his RFC determination, he followed the prescribed two-step process of first examining whether there is an underlying medically determinable impairment that could reasonably be expected to produce Plaintiff's symptoms, and,

---

[125]   See id.

[126]   See id.

[127]   See id. 20 C.F.R. Pt. 404, Subpt. P, App. 1 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416(920(d), 416.925, and 416.926, ("the Listings").

[128]   See Tr. 15.

[129]   See id.

[130]   See Tr. 16.

second, evaluating the "intensity, persistence, and limiting effects of the [Plaintiff's] symptoms to determine the extent to which they limit Plaintiff's functioning."[131]   The ALJ correctly asserted that he must evaluate Plaintiff's remaining exertional and non-exertional capacities.[132]

In his discussion of Plaintiff's RFC, the ALJ noted that Plaintiff alleged that she had been unable to work because of stenosis, dizzy spells, high blood pressure, pinched nerves, and headaches as well as memory problems, fatigue, blurry vision, problems with the right arm and shoulder, and difficulty lifting and carrying more than five pounds.[133]   He also noted that Plaintiff claimed that she must lie down for thirty minutes or more, six times per day.[134]

The ALJ concluded that the objective medical findings did not provide strong support for Plaintiff's allegations of disabling symptoms or limitations to the degree she claimed.[135] More specifically, the ALJ found that the medical evidence did

---

[131]     See id.

[132]     See id.

[133]     See Tr. 17.

[134]     See id.

[135]     See id.

not provide strong support for limitations greater than a limitation to medium work.[136]

In explaining his reasoning, the ALJ stated that treatment notes from the Lyons Clinic dated July, 24, 2006, to August 3, 2010, showed that while Plaintiff went to the hospital with complaints of headaches, blurry vision, nausea, and neck-stiffness, the treatment notes also showed a normal range of motion in the extremities and no apparent distress or visible abnormalities.[137]   The ALJ also determined that Plaintiff's hypertension and anxiety were under good control with medication.[138]   The ALJ found that negative findings and symptoms that were under good control with medication were not consistent with a finding of an RFC of light or sedentary work.[139]

The ALJ next considered the records from Bretshire dating February 1, 2012, to September 18, 2012.[140]   The ALJ determined that these records showed normal findings in otoscopic examinations, normal pulmonary and cardiovascular findings, as well as normal psychiatric and musculoskeletal findings.[141]   The

---

[136]   See id.

[137]   See id.

[138]   See id.

[139]   See id.

[140]   See Tr. 18.

[141]   See id.

ALJ determined that because Plaintiff's routine examinations did not show external abnormalities and the treating physicians ordered no movement restrictions, Plaintiff's symptomatic allegations were not supported.[142]

The ALJ next turned to Dr. Kim's treatment notes concerning Plaintiff's hypertension, cervical radiculopathy of the right C7-C8, atypical vascular headache, and superventricular tachycardia.[143]

The ALJ noted that "radiological findings suggest[ed] hydrom[ye]lia involving c3-4 and c5-6 with mild to moderate stenosis."[144]  The ALJ also noted that nerve conduction studies were normal, and an electroencephalogram showed mild diffuse disturbance of cerebral function with no focal or lateralizing features.[145]  The ALJ found that these test results showed that Dr. Kim's opinion that Plaintiff was not a candidate for gainful employment was internally inconsistent.[146]  The ALJ also determined that Dr. Kim's diagnosis of Plaintiff's cervical radiculopathy, Chiari malformation I, cervical myelopathy, failed

---

[142]    See id.

[143]    See id.

[144]    See id.

[145]    See id.

[146]    See id.

back syndrome, and COPD were not supported by medically acceptable clinical laboratory findings.[147]

Dissatisfied with Dr. Kim's diagnoses, the ALJ gave little weight to Dr. Kim's assessment that Plaintiff would be absent from work four or more days a month, had a fifty percent reduction in fingering, could rarely lift less than ten pounds, would frequently experience interference with attention and concentration due to pain and other symptoms, and was incapable of even low stress jobs.[148]

The ALJ state that he gave Dr. Kim's opinion little weight because it relied in part on a diagnosis that Dr. Kim did not treat, but the ALJ failed to disclose what that diagnosis was.[149] The ALJ also found that "Dr. Kim fails to reveal the type of significant clinical and laboratory abnormalities that one would expect if the claimant were in fact disabled."[150]

The ALJ gave great weight to the post hearing non-treating neurologist, Dr. Loar.[151]  Dr. Loar evaluated Plaintiff's medical records, listened to her subjective complaints, and conducted a

---

[147]     See id.

[148]     See id.

[149]     See id.

[150]     See id.

[151]     See id.

physical examination.[152]  Dr. Loar determined that Plaintiff had normal muscle tone and strength, had normal deep tendon reflexes, and could ambulate normally without assistance.[153]  Dr. Loar also found that Plaintiff showed no objective difficulty in her ability sit, stand, move about, lift, carry or handle objects.[154] Dr. Loar noted that Plaintiff's subjective pain level did not correlate with her outward demeanor and she appeared to be in "no acute distress."[155]  The ALJ's gave great weight to Dr. Loar's RFC because it appeared to be consistent with the clinical and laboratory findings throughout the record.[156]

The ALJ gave partial weight to previous state examiners, like Dr. Wright, because their findings that Plaintiff had limited manipulative ability were not consistent with the medically acceptable clinical and laboratory findings.[157]

The ALJ also evaluated Plaintiff's obesity, noting that she had a body mass index ("BMI") ranging from 38.8 to 42.7, qualifying as extreme obesity.[158]   The ALJ gave Plaintiff's

---

[152]   See id.

[153]   See id.

[154]   See id.

[155]   See id.

[156]   See id.

[157]   See id.

[158]   See id.

subjective complaints relating to obesity some weight, but only to the extent that she was limited to medium work based on "essentially normal physical examinations."[159]   Accordingly, the ALJ found that Plaintiff had not been under a disability from January 1, 2008, through the date of his decision.[160]

Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's review, thereby transforming the ALJ's decision into the final determination in this case.[161] Plaintiff timely sought judicial review of the decision by this court.

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.   Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.   Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving that she is disabled within the meaning of the Act.   Wren v. Sullivan, 952 F.2d 123, 125 (5th Cir. 1991).   Under the applicable legal standard, a claimant is

---

[159]   See id.

[160]   See Tr. 13.

[161]   See Tr. 1.

disabled if she is unable "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).   The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to[a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920.  The analysis stops at any point in the process

upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1998).  In applying this standard, the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision denying disability benefits. Plaintiff asserts the ALJ's decision contains the following errors: (1) the ALJ failed to properly evaluate Plaintiff's mental impairments; (2) the ALJ's findings that Plaintiff's Chiari malformation I was not severe, and that Plaintiff's stenosis was not medically determinable were not supported by substantial evidence; (3) the ALJ erred in finding Plaintiff's impairments did not meet or medically equal a Listing; and (4) the ALJ's RFC finding was not supported by substantial evidence. Defendant argues that the ALJ's decision was legally sound and was supported by substantial evidence.

## A.      Evaluation of Mental Impairments

Plaintiff's first argues that the ALJ erred by incorrectly evaluating her mental impairments. Specifically, Plaintiff contends that the ALJ erred in failing to follow the special evaluation technique that must be applied when evaluating mental impairments.

At step two of the disability analysis, the ALJ considers whether a claimant has a medically determinable impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work related activities. 20 C.F.R. § 404.1520(c). An impairment is only not severe if it is such a slight abnormality that it

would have only a minimal effect on a claimant's ability to work. Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985). When a medically determinable mental impairment exists, the ALJ must apply a special technique to determine if the impairment is severe. 20 C.F.R. § 404.1520a.

The first step of the special technique is to determine whether the claimant has "a medically determinable mental impairment[]" based on the "pertinent symptoms, signs, and laboratory findings." 20 C.F.R. § 404.1520a(b)(1). If a medically determinable mental impairment exists, the ALJ is required to make a finding as to the degree of the claimant's limitation "based on the extent to which [the claimant's] impairment interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2).

To determine the degree of a claimant's functionality, the ALJ must consider: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ's decision "must include a specific finding as to the degree of limitation of each of the functional areas." 20 C.F.R. § 404.1520a(c)(3).

Here, the ALJ explained his finding briefly, stating only that Plaintiff's anxiety was not severe because it was under

control with medication, and that there were consistent reports of "negative" psychiatric findings.  Because this conclusory statement is the only explanation the ALJ offered for his finding that Plaintiff's anxiety was not severe, the ALJ clearly failed to follow the special technique for evaluating the severity of mental impairments.

Other circuits have required remand where the ALJ does not comply with the regulation except in circumstances where the error is harmless.  See Kohler v. Astrue, 546 F.3d 260, 266-69 (2nd Cir. 2008) (discussing the approach of other circuits and remanding that case because the error was not harmless in that instance).  Because the Fifth Circuit has not expressly ruled on whether remand is necessary where an ALJ fails to comply with regulation 20 C.F.R. § 404.1520a, the option not to remand is available if the error is harmless.  See Kohler, 546 F.3d at 266-67, 269.

An error is harmless if there is no possibility the ALJ would have reached a different conclusion absent the error.  See Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003). Additionally, in evaluating harmless error, procedural perfection is not required as long as the substantial rights of the parties have not been affected.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); see Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007).

Here, the ALJ stated that periodic examinations of Plaintiff revealed that her anxiety was under good control with medication, and that she was reported as having "negative" psychiatric symptoms.  The ALJ correctly noted that "negative findings upon review of systems and good control with prescription medication" are not consistent with a finding of "disabled."  The record is replete with physician records showing that Plaintiff had negative psychiatric symptoms.  Furthermore, Plaintiff had not complained of anxiety related symptoms since beginning Klonopin.

Although ALJ failed to explicitly document the application of the special technique in his decision, the ALJ's determination that Plaintiff's anxiety was not severe is supported by substantial evidence.  Additionally, because the ALJ moved beyond step two of the disability analysis, and considered Plaintiff's anxiety in his RFC analysis, the ALJ's failing to follow the documentation of the special technique is harmless error.

## B.   <u>Chiari Malformation I and Stenosis</u>

Plaintiff next contends that the ALJ's findings that Plaintiff's stenosis was not medically determinable and that Plaintiff's Chiari malformation I was not severe were not supported by substantial evidence.

At step two of the disability analysis, the ALJ must determine if Plaintiff has an impairment or combination of impairments that is severe.  20 C.F.R. § 1520(a)(4)(ii).  An

impairment is medically determinable if it is shown by clinical and laboratory findings.   20 C.F.R. § 404.1508.   Clinical and laboratory findings "are anatomical, physical, or psychological phenomena which can be shown by the use of medically acceptable laboratory and diagnostic techniques."   20 C.F.R. § 404.1528(c). Some of these techniques include "chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."   Id.

Once a medically acceptable clinical and laboratory findings show a medically determinable impairment, the ALJ must determine if that impairment is severe.   20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work related activities.   20 C.F.R. § 404.1520.   An impairment is only not severe if it is such a slight abnormality that it would have only a minimal effect on a claimant's ability to work.   20. C.F.R. § 404.1521; See also Stone, 752 F.2d at 1101.

In his decision, the ALJ determined that Plaintiff's stenosis was not medically determinable.   The ALJ offered only a brief explanation, stating that the medical record does not substantiate this condition, and, as such, it is not medically determinable.   However, MRIs of Plaintiff's cervical spine showed

stenosis.[162]    Another   MRI   showed   narrowing   of   the   neural
foramen.[163]   There  was  no  other  diagnostic  imaging  in  the  medical
record.   Plaintiff's  stenosis  was  clearly  shown  by  uncontroverted
medically  acceptable  clinical  laboratory  testing.    Therefore,  no
credible  evidence  choices  exist  to  support  the  ALJ's  finding.
The  ALJ  should  have  found  that  Plaintiff's  stenosis  was  medically
determinable.

Additionally,  the  ALJ's  conclusion  that  Plaintiff's  stenosis
was  not  medically  determinable  is  also  inconsistent  with  his  own
analysis.   In  his  RFC,  the  ALJ  noted  that  "radiological  findings
suggest  hydromyelia  involving  C3-4  and  C5-6  with  mild  to  moderate
stenosis."[164]   The  ALJ  noted  that  radiological  findings  show  the
very  impairment  he  found  not  medically  determinable.   Plaintiff's
stenosis   was   a   medically   determinable   impairment   and   was
supported  by  uncontroverted  medically  acceptable  clinical  and
laboratory  findings.    Therefore  the  ALJ's  contrary  finding  was
not  supported  by  substantial  evidence.

Regarding   Plaintiff's   Chiari   malformation   I,   the   ALJ
determined  that  Plaintiff's  Chiari  malformation  I  was  not  severe.
The  ALJ  offered  only  one  sentence  explaining  his  finding,  stating
"[Plaintiff's]  Chiari  malformation  I  is  not  a  severe  impairment

---

[162]    See Tr. 401.

[163]    See Tr. 397.

[164]    Tr. 18.

as the diagnosis by [Dr. Kim], a treating neurologist, is not supported by clinical and laboratory findings that would support such a slight abnormality having such minimal effect on [Plaintiff's] ability to work." This sentence states that the ALJ made two findings; first, that Plaintiff's Chiari malformation I was not supported by clinical laboratory findings, and, as such, was not a medically determinable impairment. Second, that the Plaintiff's Chiari malformation I was not severe

If the ALJ meant that Plaintiff's Chiari malformation I was not medically determinable, that determination was not supported by substantial evidence. The medical record contains an MRI, read by Dr. Lee, showing a Chiari malformation I. There were no other tests or imaging in the record controverting this test. Therefore, no credible evidentiary choices exist to support the ALJ's finding that Plaintiff's Chiari malformation I was not medically determinable. Plaintiff's Chiari malformation I was supported by medically acceptable tests, and, as such, is medically determinable.

The ALJ's conclusion that Plaintiff's Chiari malformation I was not severe was also not supported by substantial evidence. As previously stated, an impairment is only not severe if it is such a slight abnormality that would have only a minimal effect on a claimant's ability to work. 20. C.F.R. § 404.1521; See also Stone, 752 F.2d at 1101. Plaintiff's Chiari malformation I

received prolonged treatment, and Plaintiff's testimony and the medical records show that Plaintiff's pain and other symptoms were attributable to her Chiari malformation I.  Plaintiff's Chiari malformation I is a severe impairment, and the ALJ erred in finding otherwise.

The court next considers the ALJ's errors in context of his evaluation of the Listings.

**C.   Evaluation of Listings**

Plaintiff argues that the ALJ erred in failing find that her condition meets or medically equals a Listing. Aside from a brief mention of Listing 4.00(H)(1) regarding hypertension, the ALJ offers only a conlusory statement that Plaintiff's condition failed to meet any Listing in Appendix 1.

At step three of the sequential disability analysis, the ALJ must make a determination of whether the claimant's impairments or combination of impairments meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Appendix 1, Subpart P. According the to the Act,

> any such decision by the Commissioner of Social Security, which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination, and the reasons upon which it is based.

42 U.S.C. § 405(b)(1). The ALJ is required to discuss the evidence and explain his finding at that step.  See Audler, 501

F.3d. at 448.   In <u>Audler</u>, the ALJ wrote only one conclusory sentence stating that she found the plaintiff's impairments did not meet a listing.   <u>Id.</u>   The Fifth Circuit, also noted that while "the ALJ is not always required to do an exhaustive point-by-point discussion," but the ALJ must offer some reasoning to support his conclusion.   <u>Id.</u>   Where the ALJ offers nothing to support his conclusion, the Fifth Circuit determined that "we, as a reviewing court, simply cannot determine whether the decision is based on substantial evidence or not."   <u>Id.</u> (quoting <u>Cook v. Heckler</u>, 738 F.3d 1168, 1172 (4th Cir. 1968)).

Here, the ALJ committed exactly the type of error present in <u>Audler</u>.   Aside from a cursory mention of a Listing for hypertension, the ALJ offers only the statement that he "determined that the claimant's condition does not meet the level of severity for any required for any impairment listed in Appendix 1." Like the court in <u>Audler</u>, this court is left wondering whether the ALJ's determination was based on substantial evidence.   The ALJ erred in failing to provide more.

This error alone, however, does not require reversal.   If an error is found to exist, the court must then determine if the error is harmless. <u>See</u> <u>Audler</u>, 501 F.3d at 448.   An error is harmless when there is no likelihood that the ALJ would have reached a different conclusion absent the error.   <u>See</u> <u>Frank</u>, 326 F.3d. at 622.   The error is not harmless if the substantial

rights of the parties have been violated.  See Mays, 837 F.2d. at 1364.

Here, had the ALJ considered Plaintiff's stenosis, Chiari malformation I, cervical radiculopathy, obesity, or headaches, when considering applicable Listings, such as the Listings for musculoskeletal disorders, which explicitly mentions "stenosis," there is a possibility that the ALJ could have found that Plaintiff's impairments would meet or medically equal a Listing.

The ALJ's errors at step two and three of the disability analysis violated Plaintiff's substantial rights.    Further consideration consistent with this opinion is required.    Because the preliminary errors are significant, the court declines to address Plaintiff's additional arguments regarding Plaintiff's RFC.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion be **DENIED** Plaintiff's motion be **GRANTED**.    It is **RECOMMENDED** that this action be **REMANDED** for further consideration consistent with this opinion.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.    Failure to file written objections within the

time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>19</u>th  day of July, 2016.

_____
U.S. MAGISTRATE JUDGE